1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   JACK P., a minor, by and
     through JESSICA P., his
12   Guardian ad Litem,
                                          NO. CIV. S-04-896 LKK/PAN
13
             Plaintiff,
14
        v.                                      O R D E R
15
     AUBURN UNION ELEMENTARY
16   SCHOOL DISTRICT,

17           Defendant.
     _____/
18

19       Plaintiff, Jack P., through his Guardian Ad Litem, Jessica P.

20   ("parent" or "Ms. P."), appeals an administrative due process

21   hearing decision by the California Special Education Hearing

22   Office.  Plaintiff brings this action pursuant to the Individuals

23   with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et

24   seq., alleging that the Hearing Officer ignored substantial

25   evidence, failed to apply appropriate legal analysis, disregarded

26   law and fact, and was arbitrary and capricious when he reviewed

                                    1

plaintiff's complaint against the defendant district's proposed
individualized education program ("IEP").  This matter comes before
the court on the parties' cross-motions for summary judgment.

## I.

### BACKGROUND

Plaintiff, an eight-year-old autistic minor, was enrolled as
a student at defendant district's school during the 2002-2003,
2003-2004, and extended 2003 school year.  During this time,
plaintiff's parent and defendant district disagreed as to
plaintiff's special education needs and services.  Ms. P did not
agree that the District had assessed plaintiff in all areas of
suspected disability or had provided a free appropriate public
education ("FAPE") for the relevant school year periods.

On July 10, 2003, Ms. P filed a request for an administrative
due process hearing with the California Special Education Hearing
Office ("CSEHO") pursuant to 20 U.S.C. § 1415.  As provided by
IDEA, whenever a parent disagrees with a proposed individualized
education program ("IEP"), the parent may file a complaint and
receive an impartial due process hearing conducted by the state
education agency.  20 U.S.C. § 1415(b)(6),(f)(1).

The due process hearing occurred in 2003 on November 20-21 and
December 2, 4, 5, 9-11, 16-18, and 23.  In a written decision
issued on February 5, 2004, the CSEHO ruled for the defendant
district on all the issues regarding disability assessment and
defendant district's provision of free appropriate public
education.  The Hearing Officer also concluded that plaintiff was

2

1  not entitled to compensatory education services and plaintiff's

2  parent was not entitled to reimbursement for privately provided

3  educational services during the relevant period.

4      Plaintiff now appeals the Hearing Officer's decision asserting

5  a variety of grounds which are considered herein.

6                              **II.**

7                      **STANDARD OF REVIEW**

8  **A.  SUMMARY JUDGMENT STANDARDS UNDER FED. R. CIV. P. 56**

9      Summary judgment is appropriate when it is demonstrated that

10 there exists no genuine issue as to any material fact, and that the

11 moving party is entitled to judgment as a matter of law.  Fed. R.

12 Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398 U.S. 144,

13 157 (1970); Secor Limited v. Cetus Corp., 51 F.3d 848, 853 (9th

14 Cir. 1995).

15     Under summary judgment practice, the moving party

16         [A]lways bears the initial responsibility of
           informing the district court of the basis for
17         its motion, and identifying those portions of
           "the pleadings, depositions, answers to
18         interrogatories, and admissions on file,
           together with the affidavits, if any," which
19         it believes demonstrate the absence of a
           genuine issue of material fact.
20

21 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

22 nonmoving party will bear the burden of proof at trial on a

23 dispositive issue, a summary judgment motion may properly be made

24 in reliance solely on the 'pleadings, depositions, answers to

25 interrogatories, and admissions on file.'"  Id.  Indeed, summary

26 judgment should be entered, after adequate time for discovery and

1  upon motion, against a party who fails to make a showing sufficient

2  to establish the existence of an element essential to that party's

3  case, and on which that party will bear the burden of proof at

4  trial.  See id. at 322.  "[A] complete failure of proof concerning

5  an essential element of the nonmoving party's case necessarily

6  renders all other facts immaterial."  Id.  In such a circumstance,

7  summary judgment should be granted, "so long as whatever is before

8  the district court demonstrates that the standard for entry of

9  summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

10  at 323.

11      If the moving party meets its initial responsibility, the

12  burden then shifts to the opposing party to establish that a

13  genuine issue as to any material fact actually does exist.

14  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

15  586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

16  391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

17      In attempting to establish the existence of this factual

18  dispute, the opposing party may not rely upon the denials of its

19  pleadings, but is required to tender evidence of specific facts in

20  the form of affidavits, and/or admissible discovery material, in

21  support of its contention that the dispute exists.  Fed. R. Civ.

22  P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First Nat'l

23  Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.

24  1998).  The opposing party must demonstrate that the fact in

25  contention is material, i.e., a fact that might affect the outcome

26  of the suit under the governing law, Anderson v. Liberty Lobby,

4

1 | Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Assoc. of
2 | Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992)
3 | (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,
4 | 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine,
5 | i.e., the evidence is such that a reasonable jury could return a
6 | verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see
7 | also Cline v. Industrial Maintenance Engineering & Contracting Co.,
8 | 200 F.3d 1223, 1228 (9th Cir. 1999).

9 | In the endeavor to establish the existence of a factual
10 | dispute, the opposing party need not establish a material issue of
11 | fact conclusively in its favor. It is sufficient that "the claimed
12 | factual dispute be shown to require a jury or judge to resolve the
13 | parties' differing versions of the truth at trial." First Nat'l
14 | Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631.
15 | Thus, the "purpose of summary judgment is to 'pierce the pleadings
16 | and to assess the proof in order to see whether there is a genuine
17 | need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R.
18 | Civ. P. 56(e) advisory committee's note on 1963 amendments); see
19 | also International Union of Bricklayers & Allied Craftsman Local
20 | Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.
21 | 1985).

22 | In resolving the summary judgment motion, the court examines
23 | the pleadings, depositions, answers to interrogatories, and
24 | admissions on file, together with the affidavits, if any. Rule
25 | 56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093
26 | (9th Cir. 1999). The evidence of the opposing party is to be

1  believed, <u>see</u> <u>Anderson</u>, 477 U.S. at 255, and all reasonable
2  inferences that may be drawn from the facts placed before the court
3  must be drawn in favor of the opposing party, <u>see</u> <u>Matsushita</u>, 475
4  U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654,
5  655 (1962) (<u>per</u> <u>curiam</u>)); <u>See also</u> <u>Headwaters Forest Defense v.</u>
6  <u>County of Humboldt</u>, 211 F.3d 1121, 1132 (9th Cir. 2000).
7  Nevertheless, inferences are not drawn out of the air, and it is
8  the opposing party's obligation to produce a factual predicate from
9  which the inference may be drawn. <u>See Richards v. Nielsen Freight</u>
10 <u>Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d
11 898, 902 (9th Cir. 1987).

12      Finally, to demonstrate a genuine issue, the opposing party
13 "must do more than simply show that there is some metaphysical
14 doubt as to the material facts. . . . Where the record taken as a
15 whole could not lead a rational trier of fact to find for the
16 nonmoving party, there is no 'genuine issue for trial.'"
17 <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

18 **B.   STANDARD FOR IDEA CASES**
19      "Congress intended judicial review in IDEA cases to differ
20 substantially from judicial review of other agency actions, in
21 which courts generally are confined to the administrative record
22 and are held to a highly deferential standard of review." <u>Amanda</u>
23 <u>J. ex rel. Annette J. v. Clark County Sch. Dist.</u>, 267 F.3d 877, 887
24 (9th Cir. 2001) (citing <u>Ojai Unified Sch. Dist. v. Jackson</u>, 4 F.3d
25 1467, 1471 (9th Cir. 1993)).  The questions of law and mixed
26 questions of fact are reviewed <u>de</u> <u>novo</u>, unless they are primarily

factual. <u>Gregory K. v. Longview Sch. Dist.</u>, 811 F.2d 1307, 1310 (9th Cir. 1987).  When reviewing an appeal of a hearing officer decision in an IDEA case, the court is to hear additional evidence outside that which was put before the hearing officer and base its decision "on the preponderance of the evidence."  <u>Capistrano Unified School Dist. v. Wartenberg By and Through Wartenberg</u>, 59 F.3d 884, 890 (9th Cir. 1995); 20 U.S.C. § 1415(e)(2).

The Supreme Court in <u>Rowley</u> held that the preponderance of the evidence standard in the statute "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." <u>Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley</u>, 458 U.S. 176, 206 (1982).  Rather, the court is to review the hearing officer's report with "due weight." <u>Id.</u>  How much deference to give to the state agency is up to the court, but the findings should not be ignored.  <u>Town of Burlington v. Dept. of Ed.</u>, 736 F.2d 773, 792 (1st Cir. 1984), <u>aff'd</u>, 471 U.S. 359 (1985).  The court must take into consideration the expertise of the hearing officer, and after careful consideration the court is free to make its own determination. <u>Id.</u>  One criterion the Ninth Circuit has found helpful in deciding how much weight to give to the hearing officer's decision is "the thoroughness of those findings." <u>Union Sch. Dist. v. Smith</u>, 15 F.3d 1519, 1524 (9th Cir. 1994); <u>Capistrano</u>, 59 F.3d at 891.

Finally, one Ninth Circuit panel said that: "Though the parties may call the procedure a 'motion for summary judgment' [it]

7

1  is in substance an appeal from an administrative determination, not

2  a summary judgment." <u>Capistrano</u>, 59 F.3d 884, 892 (9th Cir. 1995).

3  **III.**

4  **UNDISPUTED FACTS**[1]

5  **A.   BASIC INFORMATION ABOUT JACK**

6       Jack was an eight year old child in second grade living within

7  the jurisdictional boundaries of the Auburn Union Elementary School

8  District (hereinafter "District") at the time of the administrative

9  hearing.  Pl.'s SUF 1, 5; Def.'s SUF 2.  Jack has been diagnosed

10 as being on the autism spectrum with mild high-functioning

11 Pervasive Development Disorder.  Pl.'s SUF 2; Def.'s SUF 3.  As a

12 result of his autism, Jack has deficits in the areas of behavior,

13 academics, social skills, speech and language, and motor

14 development.  Pl.'s SUF 3.  Jack's deficits adversely affect his

15 educational performance.  Pl.'s SUF 4.

16      Jack is entitled to receive special education and related

17 services pursuant to the federal IDEA and state special education

18 law as a child identified with autism.  Pl.'s Compl. at ¶ 4; Def.'s

19 SUF 1.

20 **B. JACK'S ARRIVAL IN DISTRICT AND PREPARATION OF FIRST IED**

21      The District was first notified that Jack resided in the

22 District's boundaries and required special services by a letter

23 from Jack's attorney, Bob Varma, on November 7, 2002.  Def.'s SUF

24

25      [1]  All facts listed herein are undisputed unless otherwise
   noted. The facts submitted by plaintiff in the "Additional
   Statement of Undisputed Material Facts" were inappropriately
26 submitted and have not been considered.  <u>See</u> Local Rule 56-260(b).

4, citing AR at 5000;  Test. of C. Malin, at 55:4-22 of the Dec. 9, 2003 RT.  Upon receipt of Mr. Varma's letter, Claudia Malin, Coordinator of Special Education, contacted Ms. P and scheduled a meeting to visit various school sites and to develop an interim IEP.  Def.'s SUF 5, citing Test. of C. Malin, at 56:19-58:9 of the Dec. 9, 2003 RT.  The first interim IEP was developed on November 13, 2002, and provided Jack with: (1) full inclusion placement in a regular education first grade classroom; (2) full-time assistance by a 1:1 instructional aide; (3) speech and language therapy ("SLT") services 90 minutes each week; (4) occupational therapy ("OT") services 2 times each week for 45 minutes each session; and (5) behaviorist services to be determined within 30 days.  Def.'s SUF 6, citing AR at 3058-3059.

On November 19, 2002, another IEP meeting was convened where the District offered Jack the same terms as the previous IEP, but also included the goals and objectives developed by Jack's previous school district of attendance, the Fairfield-Suisun School District.  Def.'s SUF 7, citing AR at 3061-3098.  At the November 13, 2002, IEP meeting, Ms. P informed the IEP team that she never signed an IEP right away but took it home to consider it.  Def.'s SUF 8, citing Test. of C. Malin, at 60:10-13 of the Dec. 9, 2003 RT.  On or about November 20, 2002, Ms. P signed, with partial agreement, the IEPs developed on November 13, 2002, and November 19, 2002.  AR at 3058, 3097.  District staff began implementing the IEP developed on November 19, 2002 and Jack enrolled in Skyridge Elementary school in a first grade class taught by Susan Spence.

1  Def.'s SUF 10, citing Test. of C. Malin, at 63:25-64:2 of the Dec.

2  9, 2003 RT; Test. of S. Spence, at 8:8-11 of Dec. 23, 2003 RT;

3  Test. of Ms. P, at 43:26-44:4 of Dec. 4, 2003 RT.

4      The Auburn Union Elementary School District had in its

5  possession a report prepared by Fairfield-Suisun Unified School

6  District that identified Jack's deficits in auditory processing.[2]

7  Pl.'s SUF 11, citing AR at 4056-62.  The report demonstrates that

8  the prior school district conducted a psycho-educational assessment

9  of Jack's central auditory processing needs on May 24, 2002 and

10  found that Jack had "significant delays in auditory processing,"

11  that the tests indicate "delays in auditory memory," and that the

12  results were indicative of "deficits in auditory memory, auditory

13  discrimination, auditory sequencing and auditory attention."  AR

14  at 4056-62; Pl.'s SUF 14.  The Hearing Officer found that "[w]hile

15  the results of that assessment were indicative of deficits in

16  auditory memory, auditory discrimination, auditory sequencing, and

17  auditory attention, no further testing was recommended.

18  Presumably, the assessors in Fairfield-Suisun would have

19  recommended additional testing by an audiologist had they deemed

20  it necessary or advisable." Pl.'s SUF 15.

21      On December 19, 2002, another IEP meeting was convened.  AR

22  at 3100-3130.  The purpose of this meeting was to review Jack's

23  interim placement and services at Skyridge.  The parties agree that

24  

25      [2]  Defendant disputes what date the District received the
   report, but they do not seem to dispute that they actually had a
26  copy.

10

the team discussed potential assessments for Jack in the areas of Occupational Therapy ("OT"), and adaptive physical education ("APE"), but dispute the extent to which central auditory processing was discussed.  AR at 3100-3130; Test. of H. Painter, at 13:14-14:19 of the Dec. 18, 2003 RT; Test. of E. Aldrich, 131:23-132:9 of the Dec. 5, 2003 RT; Def. Resp. SUF 6 & 7, citing Test. of C. Malin at 85:19-23 of the Dec. 9, 2003 RT, 167:3-8 of the Dec. 11, 2003, RT.  Ms. Malin testified that the central auditory processing assessment was discussed at the team meeting, but that Ms. P did not want to go ahead at that time.  The plaintiff disputes this characterization.  Test. of C. Malin, at 85:19-23 of Dec. 9, 2003 RT; Pl.'s Resp. SUF 19.  Ms. P testified that Jack had been assessed in Fairfield and found to have auditory deficits, and she wanted a further assessment in that area because there were no goals and objectives developed to address the deficit in the IEP. Pl.'s SUF 10.  Following the meeting, Ms. P sent a specific written request in a letter to the District on Jan. 8, 2003 for further assessment of Jack by someone qualified to assess and treat his auditory integration issues and noted that she understood that Carol Maher was commonly chosen by the District to perform such assessment.  Pl.'s SUF 6, citing AR at 5003-04.

The District proposed an assessment plan for the OT and APE assessments, but Ms. P never consented.  AR at 4073; Test. of H. Painter, at 14:5-9 of the Dec. 18, 2003 RT.  In the letter dated January 8, 2003, that was sent to Ms. Malin, Ms. P consented to the December 19th IEP with the exception of (1) the re-written SLT

goals; (2) SLT limited to only 30 minutes; (3) SLT being provided during the school day, (4) OT being provided during the school day, and (5) tardies being indicated on the IEP.  AR at 5001-5004. Notably, Ms. P specifically consented to Ms. Chargin providing Jack's behavioral services and Discrete Trial Training ("DTT") each instructional day between 8:15 and 9:15 a.m.  AR at 5003.

Thereafter, the IEP team proposed modifications to Jack's goals and objectives; adding 1:1 instructional services for 50 minutes each instructional day; and reducing his OT to 20 minutes each session. AR at 3100-3130.  The District mailed or hand-delivered[3] an assessment plan on or about February 3, 2003.  AR at 2015.  The District's plan called for an assessment of "Central Auditory Processing" to be done by the speech therapist and the school psychologist.  Pl.'s SUF 9.

Eleanor Ross Aldrich was the speech and language therapist assigned to Jack's case by the District.  Pl.'s SUF 16.  Ms. Aldrich testified that it is pretty typical for children on the autism spectrum of disorders to have concerns around auditory processing.  Pl.'s SUF 17.  Ms. Aldrich testified that central auditory processing disorders or auditory processing disorders are diagnosed with the use of instrumentation that the District does not own and that she is not trained to use.  Pl.'s SUF 18-19.

////

////

---

[3] The parties dispute whether it was mailed or hand-delivered.

While she has experience using the equipment, Ms. Aldrich testified that because she is not an audiologist, she could not provide a test that would diagnose auditory processing disorders. Pl.'s SUF 20.

Ms. Aldrich testified that the assessment offered by the District would have been a screening to determine the likelihood of whether a central auditory processing deficit existed, and when asked if what she described as her ability to screen was consistent with what was identified as a central auditory processing assessment by the plan, she replied that all she could do is check to see the likelihood of central auditory processing deficit, but that her screening would not identify the deficits.  Pl.'s SUF 21-23.  Ms. Aldrich testified that her screening would not provide information that would be adequate for remediation of a central auditory processing deficit. Pl.'s SUF 24.  Ms. Aldrich further testified that an assessment conducted by Ms. Maier, an audiologist, would be different from the one proposed by the District in its assessment plan of February 3, 2003.  Pl.'s SUF 25.

On February 3, 2003, the District received notice that Ms. P had filed a compliance complaint with the California Department of Education ("CDE") regarding the implementation of Jack's IEP.  AR at 2000-2009.  Specifically, Ms. P complained that (1) the District did not provide an assessment plan for auditory integration/processing issues, (2) did not provide speech and language data and notes from the pull-out sessions, (3) pulled Jack out without Ms. P's consent and (4) did not provide her with a copy

1  of her son's IEPs.  AR at 2007.  The California Department of
2  Education investigated a complaint by Ms. P and found that the
3  District had not timely submitted an assessment plan and delayed
4  in providing Jack records, but dismissed Ms. P's other two
5  complaints.  AR at 2025-34.

6      The same day Ms. Malin was notified that a complaint was
7  filed, she sent Ms. P a letter (1) offering to provide Jack with
8  SLT and OT after school until the IEP meeting scheduled on February
9  26, 2003; (2) enclosing a copy of the December 19th IEP; and (3)
10  offering to assess Jack's central auditory processing needs and
11  enclosing an assessment plan. AR at 2010-2016. It is disputed
12  whether Ms. P ever responded to this letter, but defendant cites
13  testimony that Ms. P refused the services in a phone call with Ms.
14  Painter.  Test. of H. Painter, at 19:1-23 of the Dec. 18, 2003 RT.

15      The District convened a series of IEP meetings for Jack on
16  February 26, March 3, March 18, and March 26, 2003.  AR at 3134-
17  3176.  Over the course of these meetings, the team reviewed his
18  present levels of performance, progress, and goals and objectives.
19  AR at 3134-3176.  The District continued to offer Jack the same
20  program, placement, and services, but modified his services to (1)
21  increase SLT to 40 minutes each pull-out session during the school
22  day; (2) increase OT to 30 minutes each pull-out session during the
23  school day; and (3) add team meetings twice each month.  AR at
24  3134-3176.  On April 30, 2003, more than one month after the IEP
25  was developed, Ms. P consented in full to the offered IEP,
26  including the goals and objectives, and pull-out related services.

14

AR at 3175.  Upon the parent's consent, District staff began implementing all components of Jack's IEP.  Test. of E. Chargin, at 119:10-24 of Dec. 10, 2003 RT; Test. of H. Painter, at 24:9-17 of Dec. 18, 2003 RT; Test. of E. Aldrich, at 152:27-153:2 of Dec. 5, 2003.

**C.   PROVISION OF ESY AND EXTENDED ESY**

On May 20, 2003, the District convened another IEP meeting, this time to develop a plan for the 2003 extended school year ("ESY" or summer school).  AR at 3177-3219.   The IEP team reviewed Jack's progress on each of his goals and determined those which he had met, made progress on, or not made head-way on.  AR at 3177-3219.  Ms. Chargin testified that Jack made great progress on his behaviors, however the parties dispute the extent of the progress and the manner in which it was documented.  AR at 4089; Pl.'s Resp. SUF 38.  The IEP offered an ESY program that consisted of a 4-week program at Auburn Elementary School wherein Jack would have received a continuation of the 2002-2003 school year program, placement and services.  AR at 3177-3219.  The plan indicated that Jack was to participate in an additional 4-week program, but did not specify the exact nature of the program.  AR at 3219.  In a letter to Ms. Malin dated June 1, 2003 (fax stamp shows received June 11, 2003), Ms. P wrote that she had taken her son's program binder home to review and based upon her review she thought Jack was regressing in all areas.  AR at 5014.

Claudia Malin testified as the Special Education Coordinator for the Auburn Union Elementary School District and as the "School

1   Administrator or Designee" for Jack's IEP on May 20, 2003.  Pl.'s

2   SUF 27, 28.  Ms. Malin testified that the District's offer of

3   placement and services for the ESY  was contained on page one and

4   page 43b of the May 20, 2003 IEP document.  Pl.'s SUF 29.  The IEP

5   document of May 20, 2003, states that Jack is to spend 100% of his

6   time in general education with special education support and/or

7   services and has the box for ESY checked.  Pl.'s SUF 30.  The box

8   does not contain an explanation of the specific services in the

9   space provided, although the notes in subsequent pages do explain

10  that Jack will attend summer school at Auburn Elementary from June

11  23, 2003, to July 19, 2003 and extended ESY for "up to an

12  additional four weeks to maintain skills."  Id.  The IEP notes do

13  not state the length of the school day for summer school.  Pl.'s

14  SUF 33.  However, Ms. P testified at one point that she understood

15  that ESY would include 3 hours of discrete trial training.  See

16  Test. of Ms. P, at 157:8-19 of the Nov. 21, 2003 RT.  The IEP notes

17  state that Jack will also attend an "extended" summer school, with

18  dates "to be determined up to 4 wks to maintain skills."  Pl.'s SUF

19  34.

20       The May 20, 2003, IEP document contains a notation that the

21  next IEP team meeting for Jack would be held on September 30, 2003.

22  Pl.'s SUF 35.  When asked whether the IEP of May 20, 2003 indicates

23  the amount of one-to-one instruction Jack would receive, Ms. Malin

24  testified that it does not note the time on the document.  Test.

25  of C. Malin, at 175:27-176:5 of the Dec. 11, 2003 RT.  Although Ms.

26  Malin also testified that the IEP indicated that one-to-one

16

direction would be given five times weekly for 60 minutes during

the school year and that she believed the conversation of the IEP

team was that the summer school and extended summer school would

be similar to this if not the same. Test. of C. Malin, at 176:10-

24 of the Dec. 11, 2003 RT. Ms. Malin further testified that she

did not anticipate any changes to the amount of one-to-one

instruction except that it might look a little bit different during

the extended ESY because there were not going to be many other

students to work with during that period. Test. of C. Malin, at

177:1-8 of the Dec. 11, 2003 RT. However, Ms. Malin also testified

that she thought summer school ran for either four or four-and-a-

half hours, she was not quite sure. Pl.'s SUF 42, citing Test. of

C. Malin, at 180:17-27 of the Dec. 11, 2003 RT. It was going to

be up to Ms. Chargin to develop the exact period once they

determined the number of students, the teacher, etc. Test. of C.

Malin, at 193:4-15 of the Dec. 16, 2003 RT. She thought Ms.

Chargin was prepared to do one-to-one for up to four hours,

depending upon what was going to be best for Jack. Pl.'s SUF 42,

citing Test. of C. Malin, at 180:17-27 of the Dec. 11, 2003 RT.

In response to whether the District was offering Jack one-to-

one services in the amount of up to four hours per day during ESY,

Ms. Malin testified "[i]t could have been if that was what was

appropriate." Pl.'s SUF 43. Ms. Malin testified that she did not

write the specific details of what the program looked like on the

IEP because it was still evolving and the time and frequency of

services was the offer of a free appropriate public education.

1   Pl.'s SUF 44-45.  When asked about the services Jack would receive
2   in the extended ESY, Ms. Malin testified that he would have gotten
3   everything that was listed on the front page of his IEP.  Test. of
4   C. Malin, at 181:24-27 of the Dec. 11, 2003 RT.  Ms. Malin also
5   testified the extended ESY would have been the same duration as the
6   ESY, around four hours, but she did not have the exact time-frame
7   at the IEP meeting in May of 2003.  Test. of C. Malin, at 182:1-8
8   of the Dec. 11, 2003 RT.  Ms. Malin testified that Jack had not
9   attended the summer school or extended ESY program in the District
10  previously.  Test. of C. Malin, at 182:11-12 of the Dec. 11, 2003
11  RT.

12      When asked if the IEP of May 20, 2003, contained the full
13  offer for ESY or if there was going to be another IEP team meeting
14  Ms. Malin testified in response: "No, this is - uh - our offer
15  . . . . it's kind of confusing I think to even - uh - people here
16  at this table what that looked like." Pl.'s SUF 40, citing Test.
17  of C. Malin, at 178:21-27 of the Dec. 11, 2003 RT.  Ms. Malin
18  testified that team meetings would continue during ESY and the IEP
19  team would have reconvened if Jack's program needed to be adjusted.
20  Test. of C. Malin, at 192:14-25 of the Dec. 16, 2003 RT.

21      Ms. Chagrin testified that they were thinking of increasing
22  the one-to-one time to between 2-3 hours. Test. of E. Chargin, at
23  36:5-15 of Dec. 11, 2003 RT.  At the time of the May 20, 2003 IEP
24  meeting, Ms. Chargin testified that she thought that Jack would
25  have a longer school day than the typical 8:30 am to 12:10 pm ESY
26  school day and that there was a consensus that the discrete trial

1   training provided in the ESY to Jack would be longer than one hour
2   per day.  Test. of E. Chargin, at 36:1-4, 36:18-22, 37:3-1 of Dec.
3   11, 2003 RT; Pl.'s SUF 53, citing Test. of E. Chargin, at
4   38:27-39:3 of Dec. 11, 2003 RT.

5        Ms. Chargin was under the belief that the ESY program for Jack
6   would have been with regular education children who were behind in
7   academics such as reading and math.  Pl.'s SUF 54, citing Test. of
8   E. Chargin, at 40:1-12 of Dec. 11, 2003 RT.  As regular school was
9   not in session during the extended ESY, Ms. Chargin testified that
10  Jack would not have been with typically functioning peers during
11  the day.  Test. of E. Chargin, at 42:9-17 of the Dec. 11, 2003 RT.
12  Ms. Chargin did not know what the length of Jack's school day would
13  have been during the extended ESY.  Pl.'s SUF 55, citing Test. of
14  E. Chargin, at 41:9-13 2 of Dec. 11, 2003 RT.  During the extended
15  ESY, Jack's entire day would have been one-to-one training
16  including OT and SLT.  See Test. of H. Painter, at 27:12-22 of Dec.
17  18, 2003 RT; Test. of E. Aldrich, at 161:22-163:7 of the Dec. 5,
18  2003 RT.

19       The team agreed that the aide, Ms. Hedenland, could bring her
20  12 year old daughter to the extended ESY with Jack.  Test. of E.
21  Chargin, at 42:22-43:4 of the Dec. 11, 2003 RT.  The Hearing
22  Officer found that, "the evidence presented at hearing demonstrates
23  that Lisa Hedenland was appropriately qualified to serve as Jack's
24  one on one instructional aide and that Jack benefitted
25  educationally from his placement and her services during the
26  2002-2003 school year.  Pl.'s SUF 68.

1       Pursuant to the IEP, Erin Chargin, owner and Director of
2  Learning Solutions, provided Jack with behavior consultation
3  services with the assistance of an instructional aide, overseeing
4  Jack's behavioral intervention plans, positive reinforcement
5  systems, and direct instruction.  Test. of E. Chargin, at 4:21-23,
6  at 30:22-31:11 of Dec. 10, 2003 RT; AR at 3061-3098.  Ms. Chargin
7  is an experienced behavorist knowledgeable in Applied Behavior
8  Analysis and in working with children with Autism.  Test. Of E.
9  Chargin, at 5:6-25, 7:26-8:5, 22:16-18 of the Dec. 10, 2003 RT.
10 She has a Master's Degree in special education and a teaching
11 degree in early intervention/early childhood special education; she
12 has a teaching credential for the state of Oregon which she was
13 working on transferring to California at the time of her testimony.
14 Pl.'s SUF 67; Test. of E. Chargin, at 11:25-26, 186:14-16 of the
15 Dec. 10, 2003 RT.

16     Ms. Chargin trained school staff throughout the 2002-2003
17 school year through ongoing consultation and team meetings.  Test.
18 of E. Chargin, at 6:18-30:17 of Dec. 10, 2003 RT; Test. of L.
19 Hedenland, at 19:25-22:11 of Dec. 17, 2003 RT; Test. of S. Spence,
20 at 16:24-18:24, 48:18-49:5 of Dec. 23, 2003 RT.  Ms. Chargin
21 testified that she was experienced in tracking data and that it is
22 a necessary part of an autistic program for a child because it
23 tells if the interventions being used are working.  Pl.'s SUF 65-
24 66.

25 ////

26 ////

Ms. Chargin was aware that each of Jack's individual programs had not been run every day during discrete trial training and testified that it was her hope to address that in the ESY by increasing the amount of discrete trial training he received. Pl.'s SUF 59.  Ms. P was unsure of how many hours of one-to-one discrete training was to be given, she thought it would be either two or three hours.  See Test. of Ms. P, at 157:15 of Nov. 21, 2003 RT and 37:3-6 of Dec. 4, 2003 RT.  Ms. Chargin testified that her progress reports were based partly on data from DTT and also from other observations or while working with Jack.  Test. of E. Chargin, at 56:11-58:3 of the Dec. 11, 2003 RT.  Chargin also testified that she learned that Jack could count up to 50 from observing him in other environments where data was not recorded. Test. of E. Chargin, at 49:12-26 of the Dec. 11, 2003 RT.  Although Ms. P had consented to Ms. Chargin's continued services one month prior, Ms. P complained that Ms. Chargin "had ensured failure" of Jack's program.  AR at 5015.

The Hearing Officer found that "[t]he fact that the behaviorist might propose an increase in the amount of discrete trial training, depending upon Jack's ability to participate in the full-inclusion setting, does not render the District's offer unclear, particularly in light of the fact that she had not had an opportunity to observe him in that setting as of the May 20, 2003 IEP meeting."  Pl.'s SUF 26.

On June 23, 2003, the first day of the 2003 ESY, Jack's program, placement, and services were ready to begin but Ms. P had

21

withdrawn Jack from the school.  AR at 5014-16; Test. of C. Malin, at 104:5-24 of Dec. 9, 2003 RT; Test. of H. Painter, at 28:13-15 of Dec. 18, 2003 RT; Test. of Ms. P, at 122:22-123:4 of Dec. 2, 2003 RT.  On June 24, 2003, the District sent a letter to Ms. P explaining that it was a "great concern" that the specialists were waiting to serve Jack and that "he is missing out on the gains he might be making . . . ."  AR at 5016.  In response to the District's letter, on June 25, 2003, Jack's attorney, Bob Varma, sent a letter requesting that within one week, the District remove Ms. Chargin from Jack's program and contract with Bridges Behavioral Language Systems ("Bridges") for an assessment and services, or face a due process hearing.  AR at 5017.[4]  On July 2, 2003, Anne Sherlock, attorney for the District, responded to Mr. Varma's letter and stated that the District believed Ms. Chargin had been doing an excellent job with Jack and continued to be an appropriate provider.  AR at 5018-5019.  However, in order to get him back into school, the District agreed to change Jack's behaviorist to another non-public agency and agreed to contact Mr. Varma once it selected an appropriate service provider.  AR at 5018-5019.

A few days later, Ms. Sherlock notified Mr. Varma that the District had contracted with Teaching Autistic Children ("TAC") to provide Jack's behavioral services and offered an assessment plan.

---

[4]  Defendant tries to point out that Bridges is/was a client of Mr. Varma.  It is disputed, however, as to whether this is true or whether it is relevant.  <u>See</u> SUF 47.

1   AR at 5023-5024.  Mr. Varma requested a due process hearing on July

2   10, 2003.  Pleadings and Correspondence 242-243.  Jack did not

3   attend any of the offered 2003 ESY program and Ms. P did not

4   consent to the TAC services or assessment.  AR at 5023-5025; Test.

5   of H. Painter, at 28:13-15 of Dec. 18, 2003 RT.

6   **D. THE 2003-2004 SCHOOL YEAR**

7       The parties participated in mediation on August 22, 2003.  AR

8   at 1000-1003.  At the mediation the District agreed to contract

9   with Bridges[5] to train Jack's instructional aide, Lisa Hedenland.

10  AR at 1001.  Bridges provided some training to Ms. Hedenland on

11  September 2, 3, and 4, 2003.  AR at 1001; Test. of L. Hedenland,

12  at 63:14-18 of Dec. 17, 2003 RT.  The training on September 2,

13  2003, occurred in Jack's home, and included the training of a

14  Bridges in-home tutor.  Test. of L. Hedenland, at 63:24-65:18 and

15  66:12-22 of Dec. 17, 2003 RT; Test. T. Mills, at 53:11-16 of Nov.

16  21, 2003 and 113:12-114:1 of the Nov. 20, 2003 RT.  The parties

17  dispute whether the District knew this would occur.  The training

18  was provided by Tara Mills and Danielle McClane, employees of

19  Bridges.  Test. of T. Mills, at 94:19, 123:2-4 of the Nov. 20, 2003

20  RT; Test. of L. Hedenland, at 66:5-6, 67:3-14 of Dec. 17, 2003 RT.

21  Ms. Hedenland's training from Bridges was general in nature and

22  occurred prior to the development of Jack's behavior plan.  AR at

23  4102-4108; Test. of L. Hedenland, at 63:14-18, 66:7-20, 67:14-20

24  of Dec. 17, 2003 RT.

25  _____

26       [5]  A non-public agency that was preferred by Ms. P.

23

1    Ms. Malin testified that she signed a contract (that was not
2   ratified by the Board) or individual service agreement with Bridges
3   for services for Jack to be provided from September 1, 2003
4   onwards, in the rate of 20 hours per month by a Master's level
5   consultant.  December 11, 2003 RT at 193:1-197:1-28.  Ms. Malin
6   testified that Bridges provided service to Jack on the District's
7   school site pursuant to the mediation agreement, contract and/or
8   service agreement.  December 11, 2003 RT at 193:1-197:1-28.
9   Bridges assigned Tara Mills as the Master's level behavior
10  consultant to oversee Jack's educational program at school.  Test.
11  of A. Gifford, at 76:23-25 of Dec. 4, 2003 RT; Test. of C. Malin,
12  at 135:7-13 of Dec. 11, 2003 RT.  Defendant disputes Ms. Mills'
13  qualifications, claiming that Ms. Mills received her degree from
14  an online unaccredited institution.  Def.'s SUF 69, Test. of C.
15  Malin, at 135:7-16 of Dec. 11, 2003 RT.  Ms. Malin testified that
16  her decision to hire Bridges to oversee Jack's behavioral program
17  may have been affected if she had known about Ms. Mills'
18  qualifications.  Test. of C. Malin, at 135:7-134:6 of Dec. 11, 2003
19  RT.

20    Prior to Jack returning to school in the 2003-2004 school
21  year, Ms. P requested that Ms. Mills of Bridges conduct an
22  assessment which included recommendations for Jack in the school
23  environment, although Ms. Mills had not yet observed him in the
24  school setting or interviewed his teacher.  AR at 4091-4101; Test.
25  of T. Mills, at 47:21-48:9, 51:4-6 of Nov. 21, 2003 RT.  With
26  respect to the 2003-2004 school year, from September to November

of 2003, the Hearing Officer found that, "Ms. Mills testified that at the IEP meeting on October 9, 2003, the District requested that she provide additional training regarding the implementation of the behavior plan. Ms. Mills and Ms. Hedenland testified that Ms. Hedenland needed more training. Ms. Mills further testified that she and [Ms. P.] had discussed Ms. Hedenland and agreed that Ms. Hedenland would be an appropriate aide with more training." Pl.'s SUF 69.

Jack returned to school on September 4, 2003.  Upon his return, the District staff planned to implement his last agreed upon IEP consented to by Ms. P on April 30, 2003. Test. of C. Malin, at 117:3-18 of Dec. 9, 2003 RT.  For the 2003-2004 school year, Jack was placed at Skyridge in a second grade classroom taught by Susan Quail, a qualified teacher who had prior experience with full inclusion students. Test. of D. Chandler, at 23:23-25:11 of the Dec. 5, 2003 RT; Test. of S. Quail, at 64-68 of Dec. 18, 2003 RT.  Ms. Hedenland continued as Jack's instructional aide. Test. of L. Hedenland, at 59:24-27 of Dec. 17, 2003 RT.  Ms. Hedenland was to be responsible for addressing his behaviors, implementing multiple positive reinforcement systems, recording several types of data, and assisting Jack with his class work. Test. of L. Hedenland, at 6:11-16 , 24:17-26:27 and 33:5-34:6 of Dec. 17, 2003 RT.

Once Jack returned to school, Ms. Aldrich and Ms. Painter attempted to implement Jack's SLT and OT.  Test. of E. Aldrich, at 164:17-165:22 of Dec. 5, 2003 RT; Test. of H. Painter, at 29:3-30:5

1  of Dec. 18, 2003 RT.  However, Ms. P sent several letters to the

2  District demanding that such services not be provided until a time

3  for pull-out was determined by the team, which prevented

4  implementation of Jack's SLT and OT. AR at 5033-5036.

5      On October 9, 2003, the District convened an IEP meeting to

6  conduct an annual review of Jack's IEP. AR at 3220-3223.  During

7  the meeting on October 9, 2003, which lasted more than 3 hours, the

8  IEP team reviewed Jack's present levels of performance, reports

9  from Bridges, academic testing by Ms. Quail, and his progress on

10 his previous goals and objectives.  AR at 3220-3223; Test. of C.

11 Malin, at 124-129 and 147:1-12 of Dec. 9, 2003 RT.  The District

12 team members discussed additional training on the behavior plan

13 that was drafted by Bridges, and it was agreed that such training

14 would occur for Ms. Hedenland and the substitute aides.  AR at

15 5051-5052; Test. of C. Malin, at 149:3-23 of the Dec. 9, 2003 RT

16 and at 121:4-222:12 of the Dec. 11, 2003 RT.  The parties dispute

17 what was agreed to at the end of the meeting -- plaintiff believes

18 that Ms. P wanted the goals to be completed by the end of the

19 meeting, while defendants state that the team agreed to meet again

20 to discuss the proposed goals and objectives on October 20th.

21 Test. of C. Malin, at 144:19-26, 145:17-21 of the Dec. 9, 2003 RT;

22 AR at 5051-5052.

23     The parties dispute why, but the District claims it was not

24 able to conclude the IEP meeting commenced on October 9, 2003.

25 Test. of C. Malin, at 140:1-142:25 of the Dec. 11, 2003 RT.  Ms.

26 P requested that the meeting continue that day until it was

1   completed.  Test. of C. Malin, at 146:18-147:12 of the Dec. 9, 2003

2   RT.  The District requested that the meeting be reconvened.  AR at

3   5051-5052 and 5059-5060; Test. of C. Malin, at 140:7-142:22 of the

4   Dec. 11, 2003 RT.  The team discussed potential dates to reconvene

5   the IEP meeting to discuss program, placement, and services.  Test.

6   of C. Malin, at 146:14-25 of the Dec. 9, 2003 RT.  The parties

7   dispute whether Ms. P was available at a time earlier agreed upon.

8   Pl.'s Resp. SUF 71-75; Test. of C. Malin, at 146:18-25 of the Dec.

9   9, 2003 RT.

10      On October 16, 2003, Ms. Sherlock sent Mr. Varma a letter

11   proposing that the IEP meeting continue on November 10, 13, or 14,

12   2003.  AR at 5051-5052; Test. of C. Malin, at 140:14-27 of the Dec.

13   11, 2003 RT.  Ms. P. testified that she did not receive the new IEP

14   team meeting dates until the weekend before the hearing, and that

15   the proposed dates fell on the date the hearing was scheduled to

16   begin. December 3, 2003 RT at 43:8-9.  On October 24, 2003, Mr.

17   Varma requested that the due process hearing be put back on

18   calendar.  Pleadings and Correspondence at 217.

19      On October 20, 2003, Jack ceased attending Skyridge. AR at

20   5062; Test. of C. Malin, at 125:15-18 of the Dec. 11, 2003 RT.  The

21   parties dispute whether Ms. P provided the District with notice

22   that she would be enrolling him in private services.  Pl.'s Resp.

23   SUF 81.  The District believed Jack was truant and sent letters to

24   Ms. P pursuant to Education Code section 48261, notifying her that

25   Jack had an attendance problem. AR at 5061; Test. of D. Chandler,

26   at 58:10-25 of the Dec. 5, 2003 RT.  At 9:44 on the morning of

October 20, 2003, Bridges cancelled the training session that was to start at 8:00 a.m. that day, stating that their cancellation was in response to the District's request that only a portion of the behavior plan they had prepared be used.  AR at 5049, 5057; Test. of C. Malin, at 121:8-122:22 of the Dec. 11, 2003 RT.

On November 13, 2003, the District provided Ms. P with an Administrative Offer of Placement ("Administrative Offer").  AR at 3224-27.  Defendant district claims it essentially offered to continue Jack's then current program, placement, and services, except that the behavioral services and instructional aide would be provided by Advanced Kids, a state-certified non-public agency. AR at 3224-3227; Test. of C. Malin, at 142:18-25 of the Dec. 11, 2003 RT. It also offered to continue implementing the previously agreed-upon goals and objectives dated Dec. 12, 2002.  AR at 3224-3227.

With respect to the 2003-2004 school year, from September to November of 2003, the Hearing Officer found that, "the evidence demonstrates that Jack was receiving educational benefit from the District's program. Specifically, Jack continued to receive behavior intervention services, a one to one aide, and speech and language and occupational therapy while working on his goals and objectives in his areas of need."  Pl.'s SUF 70.

During the due process hearing, the District learned that on or about December 8, 2003, Ms. P had enrolled Jack in Merryhill School, a private school.  Test. of Ms. P, at 137:17-138:5 of Dec. 2, 2003 RT and 76:18-77:4 of Dec. 23, 2003 RT.  Merryhill School

is not a non-public school certified by the State to provide
special education services to students with special needs.
See California Department of Education list of certified non-public
schools, Exhibit A to Decl. of Cannon.  Ms. P testified that her
son was receiving services from Bridges while at Merryhill School.
Test. of Ms. P, at 78:16-79:21 of Dec. 23, 2003 RT.  At the time
in dispute, Jack resided within District's boundaries. Compl. at
¶ 12.  Plaintiff has since moved from the District's boundaries and
is no longer entitled to, nor receiving, any special education
services from District. Decl. of Cannon, ¶ 3.

**VI.**

**ANALYSIS**

**A.    DID THE DISTRICT ASSESS JACK IN ALL AREAS RELATED TO THE
       SUSPECTED DISABILITY?**

Prior to becoming a student in the District, Jack was given
a psychoeducational evaluation by the Fairfield-Suisun School
District which assessed his auditory processing.  AR at 4056.  The
results from the tests given were found to be "indicative of
deficits in auditory memory, auditory discrimination, auditory
sequencing, and auditory attention."  AR at 4061.  Upon arrival in
the District, Ms. P requested that a further assessment of his
"auditory integration issues" be conducted by a qualified
individual, such as Carol Maher.  AR at 5001-5004.  The District
responded with an assessment plan in a letter date February 3, 2003
which proposed an evaluation of Jack's "Central Auditory
Processing" by a speech and language specialist and a school

1   psychologist.   AR at 2015, 2017.   Eleanor Ross Aldrich was the

2   speech and language therapist assigned to Jack's case by the

3   District, and she testified that the proposed test would involve

4   a screening process that would determine whether it was likely or

5   unlikely that Jack has a central auditory processing disorder, but

6   would not help to determine the proper remediation if the disorder

7   does exist.   Dec. 9 Test. 15:23-27 - 16:1-4.

8        Plaintiff argues that the proposed assessment by the District

9   would have just been a repeat of what was already done and would

10  not have provided the further information needed to decide what

11  action, if any, should be taken to remedy Jack's deficits.   While

12  this factual contention may be correct, it is not clear that the

13  legal standard requires that the District proceed immediately to

14  a test with an audiologist, especially since the test done by

15  Fairfield did not recommend any further testing.   Pleadings ¶¶ 36-

16  37.   The parties and the hearing officer argue that California

17  Education Code provides that a parent may request an assessment to

18  identify an individual with exceptional needs.   Cal. Educ. Code

19  § 56029.   The assessment shall be "conducted by persons

20  knowledgeable of that disability" and "not use any single procedure

21  as the sole criterion for determining whether a child is a child

22  with a disability or determining an appropriate educational program

23  for the child" and should "use technically sound instruments that

24  may assess the relative contribution of cognitive and behavioral

25  factors, in addition to physical or developmental factors."   Cal.

26  Educ. Code §§ 56320(g), 56302.5; 20 U.S.C. § 1414(b)(2)(B-C).

1    There is also a duty to reassess in § 56381 "once every three
2  years or more frequently, if conditions warrant a reassessment."
3  Cal. Educ. Code § 56381.  The duty to reassess requires the
4  District to review existing assessment data and determine what
5  additional data, if any, is needed to determine whether the student
6  has a disability in that area and whether this warrants any changes
7  in the IEP of the student.  Cal. Educ. Code § 56381(b)(2)(A-D).
8  If the District is specifically asked by the parent, it must
9  conduct the assessment even if it determines that no further data
10 is required.  Cal. Educ. Code § 56381(d).

11   The District knew that Fairfield had already done an initial
12 screening and determined that Jack showed a likelihood of having
13 a problem.  Thus it would be appropriate, after being asked to do
14 an assessment by Ms. P, to proceed with testing by someone who
15 could accurately analyze if Jack indeed had an auditory processing
16 deficit, and if so, to determine how to treat it.  Nonetheless, it
17 appears that there is no statutory standard which requires the
18 District to do so.  The cited statutory sections do require that
19 proper persons conduct the tests and that they be done using the
20 appropriate methods, but there is nothing that prohibits an initial
21 "screening" to be done first.  In light of this uncertainty, the
22 court concludes that it is appropriate to give "due weight" to the
23 finding of the administrative officer that the District had done
24 its job in offering to assess Jack's auditory processing.  The
25 court is not to "substitute its own judgments of sound educational
26 policy" for those of the District, and thus should give due weight

31

1   to the District and the hearing officer's findings and hold that

2   the District met its obligation to assess Jack's central auditory

3   processing.  <u>Rowley</u>, 458 U.S. at 206 (1982).  Since it seems that

4   Ms. P did not actively follow through after the proposed assessment

5   was offered (and continue to insist upon the type of assessment she

6   believed was appropriate), the court will not impose a greater

7   burden on the District by requiring it to consistently check in

8   with the parent after an offer is made.  Accordingly, plaintiff's

9   motion for summary judgment must be denied and summary judgment

10  must be entered for defendant.

11  **B.    WAS JACK GIVEN A FAPE FOR THE 2002-2003 SCHOOL YEAR?**

12          The District was notified that Jack was going to be enrolling

13  as a student in their district in the late fall of 2002.  Def.'s

14  SUF 4, citing AR at 5000; Test. of C. Malin, at 55:4-22 of the Dec.

15  9, 2003 RT.  The District then arranged to meet with Ms. P to go

16  over school sites and develop an interim IEP.  Def.'s SUF 5, citing

17  Test. of C. Malin, at 56:19-58:9 of the Dec. 9, 2003 RT.  They were

18  able to agree upon an initial IEP in November with an understanding

19  that they would meet again in a month to settle on a permanent IEP.

20  AR at 3058, 3097, 3100-3130.  In December they met and the District

21  made an IEP offer.  AR at 3100-3130.  Ms. P consented to the

22  December IEP except in five areas which she expressed in a letter

23  to the District in January.  Ms. P consented to Ms. Chargin

24  providing Jack's behavioral services and Discrete Trial Training

25  each instructional day.  AR at 5003.

26  ////

1    Plaintiff contests whether the implementation of this IEP
2    constituted a FAPE for the 2002-2003 school year. Plaintiff argues
3    that the IDEA calls for accountability in the implementation of the
4    IEP and that the District violated this mandate by keeping poor
5    track of data which would have enabled Ms. P to properly monitor
6    Jack's progress. The District argues that the Hearing Officer was
7    correct in finding that the District offered and provided Jack with
8    a FAPE for the 2003-2003 school year. They attempt to demonstrate
9    that Jack's IEP was adequately designed to meet Jack's needs and
10   to provide him with some educational benefit and that the IEP was
11   followed in the least restrictive environment such that Jack was
12   given a FAPE for the 2002-2003 school year.

13   While the IDEA provides detailed procedural requirements, it
14   is light on substantive requirements. <u>Rowley</u>, 458 U.S. at 205-206
15   (1982) (noting that "[c]ongress was rather sketchy in establishing
16   substantive requirements"). The Supreme Court has found that
17   "[c]ongress did not impose upon the States any greater substantive
18   educational standard than would be necessary" to make access to
19   public education "meaningful" and did not "guarantee any particular
20   level of education." <u>Id.</u> at 192. Thus, when deciding whether the
21   District provided Jack with a FAPE, the court is limited to
22   ensuring that the District put in place the appropriate IEP as
23   required by the statute and that the District implemented it in
24   such a way as to be "meaningful."
25   ////
26   ////

1      The requirements of a FAPE are that "such instruction and

2  services be provided at public expense and under public

3  supervision, [which] meet the State's educational standards,

4  approximate the grade levels used in the State's regular education,

5  and comport with the child's IEP." Rowley, 458 U.S. at 188 (1982).

6  "If personalized instruction is being provided with sufficient

7  supportive services to permit the child to benefit from the

8  instruction, and the other items on the definitional checklist are

9  satisfied, the child is receiving a 'free appropriate public

10  education' as defined by the Act." Id.

11      The Supreme Court has also concluded that the IEP must contain

12  the following:

13         A written document containing '(A) a statement of the
           present levels of educational performance of such child,
14         (B) a statement of annual goals, including short-term
           instructional objectives, (C) a statement of the
15         specific educational services to be provided to such
           child, and the extent to which such child will be able
16         to participate in regular educational programs, (D) the
           projected date for initiation and anticipated duration
17         of such services, and (E) appropriate objective criteria
           and evaluation procedures and schedules for determining,
18         on at least an annual basis, whether instructional
           objectives are being achieved.' 20 U.S.C. § 1401(19).
19

20  Id. at 182.

21      While it appears that Ms. P is primarily contesting the

22  quality of education that Jack was given, she frames her response

23  as an objection to the manner in which Ms. Chargin (Jack's

24  behavoralist) and Ms. Hedenland (his aide) kept track of the

25  progress that Jack was making and the manner in which they analyzed

26  their data to come to conclusions about his level of performance

1  on the various goals and benchmarks that were set for him in his

2  IEP.

3      The regulations adopted to help implement the IDEA require

4  that the IEP include "a statement of measurable annual goals,

5  including benchmarks or short term objectives" which address how

6  the child's special educational needs will be met so that he can

7  engage in the regular curriculum.  34 C.F.R. Pt. 300.347(a)(2).

8  The IEP must also include "a statement of how the child's progress

9  towards the annual goals . . . will be measured and how the child's

10 parents will be regularly informed" of "their child's progress

11 towards the annual goals and the extent to which that progress is

12 sufficient to enable the child to achieve the goals by the end of

13 the year."  34 C.F.R. Pt. 300.347(a)(7)(i-ii); see also 34 C.F.R.

14 Pt. 300, App. A.[6]  In order to meet the requirements of a FAPE, the

15 services must be "provided in conformity with the individualized

16 education program." 20 U.S.C.A. § 1401(8)(D).  The regulations

17 further specify that the District must "provide special education

18 and related services to a child with a disability in accordance

19 with the child's IEP; and make a good effort to assist the child

20 to achieve the goals and objectives or benchmarks listed in the

21 ////

22 ////

23 _____

24     [6]  The plaintiff, and the Anaheim decision which they
   reference (a hearing officer decision), cites 34 C.F.R. Pt. 300,
   App. C., Question 39, but this section was actually removed from
25 the CFR in the 1998-1999.  A similar discussion, however, appears
   in the current Code of Federal Regulations at 34 C.F.R. Pt. 300,
26 App. A.

1  IEP."  34 C.F.R. Pt. 300.350(a).[7]

2      Plaintiff does not appear to be challenging whether the IEP

3  included  appropriate  and  sufficient  short-term  objectives  or

4  benchmarks, but is alleging that the District failed to implement

5  these in a manner that would enable Ms. P (and presumably the

6  District itself) to monitor his progress towards meeting those

7  goals.  It is clear from the statute that Congress intended the IEP

8  to provide a way for parents to track their child's progress, it

9  does not, however, set out specific requirements as to how that

10 progress is to be monitored or provided.  That is left up to the

11 IEP drafters.  Under the "Reporting of Progress" section in the

12 December 2002 IEP, the box is checked which states that "Parent(s)

13 will be informed of the child's progress toward annual goals and

14 short-term objectives/benchmarks on the general education grade-

15 reporting schedule used by the school of attendance."  AR at 3102.

16 Additionally, the "method(s) used to communicate progress to parent

17 will be . . . [through the] report card and IEP goals and

18 objectives/benchmarks page(s)."  Id.

19     It appears from the record that the District reviewed the

20 goals and benchmarks on one or two occasions following the

21 implementation of the IEP.  The record contains a set of

22 goal/benchmark sheets which recite that the goals and objectives

23 were reviewed on March 26, 2003, though they do not contain any

24 _____

25     [7] There is no requirement, however, that the District or any
   other person be held accountable if the child does not achieve the
26 goals that are laid out.  34 C.F.R. Pt. 300.350(b).

record of the actual progress in the boxes provided.  AR at 3138-
3176.  There is also a set that indicate they were reviewed on May
30, 2003 and these contain actual records of Jack's progress on
that date.  AR at 3177-3219 (this was the end of the quarter and
thus seems to have been the appropriate time to provide reporting).
The IEP team met a number of times during the semester and went
over Jack's progress during the meetings.  Plaintiff contends that
these reports were not fairly based upon the actual recorded data
found in the record, and that the data was not adequately kept.

A review of the data and reports on Jack's behavior and his
academic performance demonstrates that there are certainly some
areas where the data is unclear or where the analysis overall is
lacking.  The record contains a number of "program check-lists"
which provide a list of the different academic areas that Jack was
to receive help with.  AR at 7000-7016.  There are fifteen
different programs and a box for each day of the week.  Id.  The
aide who ran the programs checked the boxes each day she ran them.
Every day a different number of programs would be run.  It seems,
however, that some of the activities were conducted much more
frequently than others, for example, the "school rules" seem to
have been covered about 48 times, the who/what questions were done
about 22 times, while telling time seems to only have been covered
once.  Id.  The reporting in the May 20, 2003 IEP, however, shows
that Jack was "transitional" or made "substantial progress" towards
his short-term objective/benchmarks for telling time, which were
working towards the goal of being able to "identify time to the

nearest half hour with 80% accuracy on 4 of 5 trials as measured by student work samples." AR at 3186 & 4085-86.  The plaintiff also points to numerous other asserted discrepancies such as that "sound blends were interjected into the beginning/middle/end work on individual words" and it appears that these trials may still have been used in calculating his progress on the specific goal relating only to beginning/middle/end words.

Beyond the academic goals is a list of areas where Jack had behavioral problems.  These do not show up as specific goals in the IEP, but Ms. Chargin prepared a "Behavior Intervention Plan" for Jack in February of 2003.  AR at 4075-4089 (with what appears to be an update on 5/25/03).  Ms. Chargin provided a program update on May 12, 2003 which addresses which behaviors have been exhibited, and provides a description as to whether they have ceased, decreased, etc.  AR at 4089.  This was presumably based upon the Behavior Log which notes the behavior for each day and records what was done to either reward or reprimand Jack in response.  AR at 7236-7295.

The IEP does not provide a detailed discussion of the manner in which the data will be taken or of how it will be analyzed.  AR at 3102.  Since the IDEA only requires that the services must be provided in accordance with the IEP, and the IEP was signed by Ms. P, it is difficult to judge what should be required of the District.  The federal statute contains a rule of construction which states that: "Nothing in this section shall be construed to require--(I) that additional information be included in a child's

1   IEP beyond what is explicitly required in this section." 20 U.S.C.

2   § 1414(d)(1)(A)(ii).  The Hearing Officer found that the District

3   properly revised Jack's behavioral program over the year as his

4   behaviors changed, and that the reports by Ms. Chargin and

5   Hendeland indicate that he was making progress.  There is nothing

6   in the statute which holds the District accountable for the arrival

7   of new behaviors, there is only an expectation that the District

8   will properly respond to their arrival.  It appears from the

9   revisions to the behavior plan and the occasional progress reports

10  that Ms. Chargin attempted to do that.  See Chargin Reports,

11  February, April and May of 2003, at AR at 4075-4089.

12      The Ninth Circuit has held that not every procedural violation

13  constitutes a finding that the child was denied a FAPE.  Amanda J.,

14  267 F.3d at 892.  Rather, these violations must rise to the level

15  that they "result in the loss of educational opportunity. . . or

16  seriously infringe the parent's opportunity to participate in the

17  IEP formulation process."   Id. (internal quotations omitted).

18  Here, I conclude that the failure of the District to keep

19  meticulous records is a procedural violation that does not rise to

20  the required level.  Plaintiff rightly points out that a failure

21  to keep good records could make it difficult to tell whether Jack

22  lost an educational opportunity, however, in this case the records

23  are sufficient to provide a decent picture of Jack's performance.

24  It is clear that some of the goals were met, and it is also clear

25  that Jack made little to no progress on others.  The record also

26  clearly demonstrates that Jack's mother was heavily involved in the

development of the IEP and participated in numerous meetings where she was presumably informed of Jack's behaviors and progress.[8]  She took the time to carefully review what was proposed by the District and participated in a series of meetings during the Spring of 2003 which discussed Jack's progress.  Accordingly, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted.

**C.   WAS AN ADEQUATE WRITTEN OFFER GIVEN FOR ESY FOR THE SUMMER OF 2003?**

The IEP dated May 20, 2003 provides that: "Jack will attend AUSD summer school at Auburn Elementary June 23-July 19th.  Jack will also attend an extended summer school dates to be determined up to an additional four weeks to maintain skills.  Jack will not have more than a two week break from services."  AR at 3219.  The front page of the IEP has the box for Extended School Year/Intersession checked, but no explanation is provided.  AR at 3177. The initial page also provides that the following Special Education Services will be provided: Speech/Language three times a week for 40 minutes, OT two times a week for 30 minutes, behavioral 5 hours weekly, one-to-one direct instruction five times weekly for 60 minutes, and that there will be a team meeting twice a month for sixty minutes.  AR at 3177.

////

---

[8]  There is not detailed information in the record about what occurred at these meetings, however, the court assumes that this was their purpose.

Plaintiff argues that the District failed to make a formal written offer of placement for special education services for Jack for the summer of 2003.  The IDEA requires that the District provide "written prior notice to the parents of the child whenever [it] – (A) proposes to initiate or change; or (B) refuses to initiate or change the . . . educational placement of the child . . . or the provision of free appropriate public education of the child."  20 U.S.C. § 1415(b)(3).  The notice must contain the following:

> (1) a description of the action proposed or refused by the agency;
> (2) an explanation of why the agency proposes or refuses to take the action:
> (3) a description of any other options that the agency considered and the reasons why those options were rejected;
> (4) a description of each evaluation procedure, test, record, or report the agency used as a basis for the proposed or refused action;
> (5) a description of any other factors that are relevant to the agency's proposal or refusal;
> (6) a statement that the parents of a child with a disability have protection under the procedural safeguards of this subchapter and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained; and
> (7) sources for parents to contact to obtain assistance in understanding the provisions of this subchapter.

20 U.S.C.A. § 1415(c)(1-7).

In <u>Union Sch. Dist. v. Smith</u>, the Ninth Circuit reviewed to what extent the District must follow through on this requirement to provide a formal written offer. 15 F.3d 1519, 1526 (9th Cir. 1994).  There, the District had discussions with the parents that indicated that they were not willing to accept the placement offer

41

1  that the District proposed, thus, the District considered it futile

2  to provide the offer.  The court found, however, that the offer

3  should be provided even if the District is confident that the

4  parents will reject it, stating that:

> this formal requirement has an important purpose
> that is not merely technical, and we therefore
> believe it should be enforced rigorously. The
> requirement of a formal, written offer creates a
> clear record that will do much to eliminate
> troublesome factual disputes many years later
> about when placements were offered, what
> placements were offered, and what additional
> educational assistance was offered to supplement
> a placement, if any. Furthermore, a formal,
> specific offer from a school district will
> greatly assist parents in presenting complaints
> with respect to any matter relating to the . . .
> educational placement of the child.  Id.

13  The plaintiff challenges whether a Union offer was given on the

14  grounds that the District personnel were unsure of exactly what

15  would be provided during the ESY and extended ESY.  Specifically,

16  plaintiff notes that the IEP does not set out the exact length of

17  the school day for either the ESY or the extended ESY.

18  Additionally, they argue that although the IEP clearly provides

19  that there will be 60 minutes of one-to-one instruction five times

20  a week, none of the members of the IEP team were actually sure what

21  duration of service would be provided.  There was conflicting

22  testimony by Ms. Chargin and Ms. Malin which indicated that Jack

23  might receive more one-to-one instruction.  Ms. Malin stated that

24  the offer was for one hour a day, but that it might look a little

25  bit different during the extended ESY because there were not going

26  to be many other students at school during that period.  Test. of

1  C. Malin, at 177:1-8 of Dec. 11, 2003 RT.  She said that it was
2  going to be up to Ms. Chargin to determine the exact amount of time
3  once they had determined the number of students, the teacher and
4  so on, and that they were prepared to do one-to-one for up to four
5  hours, "depending on what was going to be best for Jack."  Id. at
6  193:4-15; 180:17-27.  It is clear from Ms. Malin's testimony that
7  she was not entirely sure of the details of what would be provided
8  to Jack during the ESY and extended ESY, but that she was prepared
9  to offer, at a minimum, that which was indicated in the IEP.  The
10  testimony of Ms. Chargin is similar in that she indicates that the
11  one-to-one time will be somewhere between two and three hours, and
12  that she was unsure of the exact length of the school day.  Test.
13  of E. Chargin, at 36:1-4, 18-22, 37:3-1 of Dec. 11, 2003 RT.

14      The court understands that there was some information that the
15  District would have had trouble providing at the time (for example,
16  they had not yet hired the teacher and were not sure of the number
17  of other students that would be enrolled in the summer program);
18  nonetheless, it appears there could have been more specifics
19  provided as to the exact terms of the time of day or the duration
20  of each of the types of instruction.  That said, the IEP does lay
21  out a pretty basic offer and the District agrees that they were
22  ready to provide, at a minimum, that which was specifically
23  offered.  As discussed in the previous section, the IDEA focuses
24  on procedure rather than substantive requirements, and thus there
25  does not seem to be a specific statutory duty that they provide the
26  exact times, the name of the teachers, etc.

1    In the motion for summary judgment, the plaintiff focuses

2  exclusively on the fact that the District's staff testified

3  differently about the amount of one-to-one instruction.  Plaintiff

4  does not actually allege that the amount of services that were

5  offered in the IEP are inadequate.  It is thus difficult for the

6  court to put much weight on the variations in testimony about what

7  the different District staff thought would be provided, since what

8  was offered in writing seems to have been at least minimally

9  adequate.[9]  The Act takes the procedure very seriously and the

10 Ninth Circuit has confirmed that this written requirement should

11 be taken seriously as well, but I cannot find that an offer was not

12 made because there was some background confusion, particularly

13 given that it does not appear that Ms. P believed that there would

14 have been an adverse effect on the quality of services provided to

15 Jack.  See Rowley, 458 U.S. at 205-206 (1982) ("It seems to us no

16 exaggeration to say that Congress placed every bit as much emphasis

17 upon compliance with procedures giving parents and guardians a

18 large measure of participation at every stage of the administrative

19 process, see, *e.g.*, §§ 1415(a)-(d), as it did upon the measurement

20 of the resulting IEP against a substantive standard."); Union, 15

21 F.3d at 1526; Amanda J., 267 F.3d at 882. ("Among the most

22 important procedural safeguards are those that protect the parents'

23

24    [9]  Although it is not legally required, it is worth noting
   that there is no record that the parent ever actually sought
25 clarification on the terms of the offer.  Instead, it appears that
   she rejected the Plan and did not try to work with the District
26 further to get the clarification she now says she needed.

44

1 right to be involved in the development of their child's

2 educational plan.").[10]

3     The Hearing Officer, who observed all of the testimony, found

4 that the offer was provided, concluding that "the fact that the

5 behaviorist might propose an increase in the amount of discrete

6 trial training, depending on Jack's ability to participate in the

7 full-inclusion setting, does not render the District's offer

8 unclear."  Pleadings and Correspondence at 26.  The court agrees

9 with the Hearing Officer and thus denies plaintiff's motion for

10 summary judgment on this claim and grants defendant's cross-motion.

11 **D.   SHOULD THE COURT ORDER THE DISTRICT TO PAY BRIDGES?**

12     At the plaintiff's request, the District removed Ms. Chargin

13 from the role as Jack's behavioralist and hired Bridges Behavioral

14 Language Systems.  AR at 5017.[11]  The District contracted with

15 _____

16    [10]  I note in passing that: "To date, the Supreme Court has
not expressly determined whether a violation of the procedural

17 requirements of the IDEA is subject to harmless error review.  That
issue was not properly before it in <u>Rowley</u> because the district

18 court had failed to rule on the respondents' contention that
petitioners had failed to comply with the IDEA's procedural

19 requirements."  <u>M.L. v. Federal Way School Dist.</u>, 394 F.3d 634, 644
-645 (9th Cir. 2005); <u>but see</u> <u>W.G. v. Board of Trustees of Target</u>

20 <u>Range School Dist.</u>, 960 F.2d 1479, 1484 (9th Cir. 1992)
("Procedural flaws do not automatically require a finding of a

21 denial of a FAPE.  However, procedural inadequacies that result in
the loss of educational opportunity, or seriously infringe the

22 parents' opportunity to participate in the IEP formulation process
clearly result in the denial of a FAPE.")(internal citations

23 omitted).

24    [11]  Initially, the District wanted to hire a different company
to provide the services, but plaintiff filed a request for a due

25 process hearing and agreed to participate in mediation.  As part
of the mediation, the District consented to contract with Bridges

26 to train Jack's instructional aide, Ms. Hedenland.

1  Bridges to provide training to Jack's aide, although there is

2  dispute as to whether this was a valid contract.  <u>See</u> Test. of Ms.

3  Malin, at 193:1-197:1-28 of Dec. 11, 2003 RT).

4  Plaintiff claims that the District has not paid Bridges and

5  thus that Bridges is seeking payment from Ms. P.  Plaintiff thus

6  asks the court to order the District to pay Bridges.  However, the

7  court has not been provided with a copy of the contract, Bridges

8  is not a party to the dispute, nor does the court even know how

9  much Bridges is seeking from the District.  Defendant argues that

10  this is a matter between them and Bridges and that it in no way

11  affects whether the District provided a FAPE to Jack.

12  The court finds that the matter of Bridge's payment is not

13  properly before the court at this time as the correct parties have

14  not been joined nor has the appropriate information been provided

15  to enable the court to decide this matter.  Plaintiff's motion for

16  summary judgment is denied and defendant's motion for summary

17  judgment is granted on the question of whether a FAPE was provided

18  for the start of the 2003-2004 school year.[12]

19  **E.   WAS THE ADMINISTRATIVE PLACEMENT OFFER A VALID <u>UNION</u> OFFER?**

20  Upon the arrival of the Fall of 2003, the parties were once

21  again in the position of trying to decide how to provide the proper

22  service to Jack.  Plaintiff had rejected the IEP for the ESY and

23  ////

24

25  [12]  Plaintiff's brief appears to only challenge the provision
   of the FAPE on the grounds that it was not "free" since Bridges is
26  purportedly now seeking payment from Ms. P.

1  Jack was removed from the summer program altogether.[13]   At the
2  start of the new school year, the District planned to implement the
3  IEP that had last been signed by Ms. P in April of 2003.  Test. of
4  C. Malin, at 117:3-18 of Dec. 9, 2003 RT.  Ms. P asked the District
5  to not provide the OT and SLT until they were able to agree on an
6  appropriate pull-out time, thus preventing the District from
7  providing those services to Jack.  AR at 5033-5036.

8      On October 9, 2003, the parties met to perform an annual
9  review of Jack's IEP.  AR at 3220-3223.  During this meeting a
10  dispute occurred over whether they would complete the IEP at the
11  meeting (which had run for three hours) or whether they would
12  exchange goals, etc. over e-mail and then meet again to final the
13  plan.  Test. of C. Malin, at 144:19-26, 145:17-21 of the Dec. 9,
14  2003 RT; AR at 5051-5052 of District's Exhibits.  The parties
15  disagree on whether Ms. P was unable to attend further meetings or
16  whether she just did not want to continue in that manner.  The
17  meeting ended without a resolution.

18      The District's lawyer sent a letter to the plaintiff's lawyer
19  proposing three new meeting dates.  AR at 5051-5052; Test. of C.
20  Malin, at 140:14-27 of the Dec. 11, 2003 RT.  Ms. P. testified that
21  she did not receive the new IEP team meeting dates until the
22  weekend before the hearing and the dates fell on the date of the

23

24      [13]  It is worth noting that there is testimony in the record
   that these long periods of time without instruction can be
25  detrimental to the development of autistic
   children as it can cause them to regress in areas and to develop
26  new negative behaviors.

47

1  due process hearing she was pursuing.  Dec. 3, 2003 RT at 43:8-9.

2  Plaintiff was withdrawn from school by Ms. P on October 20th.  The

3  parties dispute whether Ms. P. informed the District that she would

4  be enrolling Jack in private services.  The District responded by

5  drafting what they called an "Administrative Offer of Placement"

6  ("AOP").  AR at 3224-27.  It states that it was designed to serve

7  as the formal Union offer of an IEP.  It is disputed why the

8  parties could not come to agreement on an IEP and it is disputed

9  what the AOP actually offered.  Plaintiff argues that the AOP is

10  invalid and not a written prior notice as required by Union and 20

11  U.S.C.A. § 1415(c)(1-7).

12      In the preparation of an IEP, the regulations require the

13  District to go to great lengths to attempt to persuade the parent

14  to participate in the IEP meetings.  34 C.F.R. Pt. 300.345.[14]  If

15  the District is unable to convince the parent to attend, then they

16  may conduct the meeting without them but must provide the IEP and

17  other relevant information to the parent even though the parent

18  chooses not to participate.[15]  34 C.F.R. Pt. 300.345(d).  Plaintiff

19  ─────────────────

20      [14]  The regulations require that the District:  (1) Notify the
   parents of the meeting early enough to ensure that they will have
21  an opportunity to attend; and (2) Schedule the meeting at a
   mutually agreed on time and place.  34 C.F.R. Pt. 300.345(1-2).
22  It appears that Ms. P did not agree on the time of the later
   meetings, but that may have been just because she was not planning
23  on attending at all.

24      [15]  The regulations do not require that changes to the IEP be
   consented to by the parent, but they are required to provide the
25  parents with notice and an opportunity to participate.  34 C.F.R.
   Pt. 300.504(a-b).  See Doe v. Alabama State Dept. of Educ., 915 F.2d
26  651, 660 (11th Cir. 1990).

alleges that she was not refusing to participate, but the record appears otherwise.  Ms. P did not agree to continue the IEP meeting, she pulled Jack from school, and said she could not meet any of the dates that the District proposed for continuation of the meeting nor did she respond with dates that would better suit her schedule.  She also requested the due process hearing.

There is no record that the IEP team did actually meet again, but such a meeting seems like an exercise in futility in light of the fact that Ms. P had already withdrawn Jack from school and sought a due process hearing.  It has been held that the failure of the school to comply with all of the different steps mandated in 34 C.F.R. Pt. 300.345 was not fatal if complying with those steps seemed futile.  Cordrey v. Euckert, 917 F.2d 1460, 1467 (6th Cir. 1990).

As noted above, the statute provides under what circumstances an offer must be made and what it must contain.  The proposed Administrative Offer may not meet all the requirements of the statute because it appears to lack items C, D, E and F.[16]

While the court is not satisfied that the AOP constituted a valid notice as required by the statute, it cannot find that the District failed to provide a FAPE for the 2003-2004 school year.  As noted, the record indicates that Ms. P pulled Jack from school and did not respond to the District's proposed dates for continued

[16]   The Hearing Officer found that the AOP constituted a formal written offer of placement that "clearly sets forth the identity of the behavioral consultant and the nature and the extent of the services to be provided."  Hearing Officer decision at 33.

1   IEP meetings.  While the court understands that Ms. P may have been

2   frustrated with the slowness of the process, there does not appear

3   to be any legal requirement that the District complete the new IEP

4   in one meeting.[17]  Once Jack was pulled from school it would have

5   been futile for the school to have further continued with the IEP

6   drafting process.  There was already an IEP in place from April of

7   2003 and the statute has a "stay-put" provision which requires that

8   the student "remain in the then-current educational placement of

9   such child" during the pendency of a due process proceeding.  20

10   U.S.C. § 1415(j).

11      While Union requires that the District still formally offer

12   an appropriate educational placement even if the parent has

13   expressed unwillingness to accept that placement, it does not

14   impose a duty on the District to offer anything further if a valid

15   program is already in place.  15 F.3d at 1526.[18]  This court is

16   bound by the Ninth Circuit but is not required to extend Union's

17   mandate that a new offer be given when a valid one is already in

18   place and the child in question has been pulled from school.  Thus,

19   rather than viewing the AOP as a "retaliatory tactic" by the

20   defendant, it appears that this was a good-faith effort to put

21   something on the table for Ms. P to work with. The fact that the

---

22

23      [17]  Keeping in mind that there also does not appear to be any
requirement for the District to have convened new IEP meetings in

24   the first place, as they are only required once a year and the
April 2003 IEP was still in place.  20 U.S.C. § 1414(d)(2)(a); 20

25   U.S.C.A. § 1414(d)(4).

26      [18]  As far as the court can tell, the April 2003 IEP remained
valid and in place.

1  process of preparing an IEP was aborted due to the withdrawal of

2  Jack from school cannot be blamed upon the District.

3      The court thus finds that the District did offer a FAPE to

4  Jack for the 2003-2004 school year and thus denies plaintiff's

5  motion for summary judgment and grants summary judgment to

6  defendant.

7  **V.**

8  **CONCLUSION and ORDERS**

9      For all the foregoing reasons, plaintiff's motion for summary

10  judgment is DENIED on all claims and defendant's motion for summary

11  judgment is GRANTED in all respects.   The Clerk is directed to

12  CLOSE the case.

13      IT IS SO ORDERED.

14      DATED:  August 23, 2005

15                              /s/Lawrence K. Karlton
                              LAWRENCE K. KARLTON
16                              SENIOR JUDGE
                              UNITED STATES DISTRICT COURT
17

18

19

20

21

22

23

24

25

26